The PEOPLE of the State of Colorado, Plaintiff–Appellant and Cross– Appellee,

v.

Jeron J. GRANT, Defendant–Appellee and Cross–Appellant.

No. 98CA2099.

Colorado Court of Appeals, Div. III.

Aug. 17, 2000.

Certiorari Granted Sept. 10, 2001.

Appeal from the District Court of El Paso County Honorable Steven T. Pelican, Judge No. 97CR1006

Ken Salazar, Attorney General, Katherine A. Hansen, Catherine P. Adkisson, Assistant Attorneys General, Denver, Colorado; Jeanne M. Smith, District Attorney, David A. Gilbert, Kim L. Kitchen, Gordon R. Denison, Deputy District Attorneys, Colorado Springs, Colorado, for Plaintiff–Appellant and Cross–Appellee

David S. Kaplan, Colorado State Public Defender, Cynthia Camp, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellee and Cross–Appellant

Opinion by Judge DAVIDSON.

The People challenge the propriety of the trial court's ruling which sentenced defendant, Jeron J. Grant, to concurrent terms. The People also seek disapproval of the court's refusal to give a jury instruction on complicity. Defendant cross-appeals the judgment of conviction entered upon jury verdicts finding him guilty of two counts of accessory to crime. We disapprove of the court's rulings and affirm the judgment.

Defendant's confessions to police, friends, and a cell mate, which were admitted at trial, stated that he and his co-defendant decided to "joke around" with a shotgun that was hidden in defendant's car. They spotted two boys walking down the street and pulled the car over. Defendant exited and confronted the boys, holding the shotgun to the head of one of them. Subsequently, according to defendant's confessions, he shot the first victim and, when the second boy tried to run away, shot him as well. Both shots proved fatal.

At trial, while defendant did not challenge the accuracy of his confession as to the events that led to the shooting, his theory of the case was that he falsely admitted to shooting the two boys and that his co-defendant had committed the murders.

## I.

The People contend that the trial court erred when it refused the prosecutor's request for a complicity instruction. Specifically, the People argue that, as a result of defendant's claim that he was not the shooter but, implicitly, the driver, the evidence was sufficient to support a jury instruction on complicity. We agree.

The complicity statute, § 18–1–603, C.R.S. 1999, provides that:

[A] person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense.

Complicity is not an offense but a legal theory by which defendant could have

been convicted. *Palmer v. People*, 964 P.2d 524 (Colo.1998). An instruction on complicity may be given when supported by evidence admitted at trial that two or more people engaged jointly in a crime. *People v. Osborne*, 973 P.2d 666 (Colo.App.1998).

Here, neighborhood residents uniformly testified that two people were involved in the incident, a shooter and a driver. Moreover, defendant did not advance an alibi or mistaken identity defense. To the contrary, defendant's expert witness advanced the theory that defendant had, in making his various confessions, switched roles with his co-defendant, the actual shooter.

Under this record of evidence, a complicity instruction was warranted. *See Thompson v. People*, 139 Colo. 15, 336 P.2d 93 (1959) (two men committed a robbery and, shortly thereafter, three men were arrested in a car which contained masks and proceeds from the robbery; conviction of the third man, who had remained in the car and did not enter the store, as an accomplice was upheld).

## II.

■ The People also seek disapproval of the trial court's ruling that consecutive sentences were not authorized. Again, we agree.

> Pursuant to § 18–1–408(3), C.R.S.1999:
> When two or more offenses are charged ... and they are supported by identical evidence, the court upon application of the defendant may require the state, at the conclusion of all the evidence, to elect the count upon which the issues shall be tried. If more than one guilty verdict is returned as to any defendant in a prosecution where multiple counts are tried ... the sentences imposed shall run concurrently; except that, where multiple victims are involved, the court may, within its discretion, impose consecutive sentences.

■ This subsection provides that the trial court must impose concurrent sentences for multiple convictions arising from the same criminal episode when there is a single victim and the convictions are supported by identical evidence. *See People v. Anderson*, 187 Colo. 171, 529 P.2d 310 (1974). However,

when multiple convictions arise from crimes committed upon different victims, the evidence is not identical. *See People v. Wafai* 713 P.2d 1354 (Colo.App.1985), *aff'd,* 750 P.2d 37 (Colo.1988); *People v. Cullen,* 695 P.2d 750 (Colo.App.1984).

Here, defendant was found guilty of accessory to manslaughter of the first victim and accessory to the murder of the second victim. Because multiple victims were involved and, thus, the evidence necessary for each conviction would not have been identical, the trial court, by the plain language of the statute, did have the authority to impose, at its discretion, consecutive sentences.

## III.

On cross-appeal, defendant claims that the trial court erred in failing to suppress a second incriminatory statement he made to police. Defendant alternatively argues that suppression was warranted because the statement was taken in violation of § 19–2–511, C.R.S.1999; the statement was the product of an illegal first statement; and it was made even though he had invoked his right to counsel. We are not persuaded.

### The First Statement

Defendant, age 17 and six months, was arrested at his home at 2:55 a.m. His mother was present. He was taken to the police department, and his parents arrived at 4:30 a.m. Defendant and his parents were informed why he was in custody and that police wanted to interview him.

The detective advised the parents and defendant, verbally and in writing, of his rights pursuant to *Miranda.* The detective then ascertained their understanding of and agreement to waive those rights and wrote their affirmative answers on individual waiver forms prepared for each parent and defendant. The parties signed their individual *Miranda* waivers.

In the presence of his parents, defendant gave an initial statement regarding what happened the night of the shooting. When the detective voiced his disbelief, defendant asked to speak with the detective alone. The

parents gave their verbal consent and left the interview room.

When defendant's next statement was also disputed, he agreed to take a polygraph exam. His parents verbally gave their permission. Prior to the administration of the exam, the detective again encouraged defendant to "come clean" and not waste time with the exam. Defendant began to cry and explained that he was scared and afraid to go to jail. Defendant was asked if he would tell the police what had happened, and he agreed to do so. The detective then said that if defendant was responsible for the boys' deaths, as he felt he was, it was going to be "extremely tough on him to live with." Defendant's parents were in an adjoining room where they could see but not hear this exchange.

At 6:00 a.m., defendant made a verbal confession, which he then wrote and signed. The parents declined the opportunity to read the statement, but they did sign the document. Defendant was then taken to a detention center.

### The Second Statement

Later that morning, the detective learned that a waiver of a juvenile's right to have his parents present during his advisement and interrogation must be in writing. The detective then arranged for a second interview with defendant and his parents. The detective did not inform them that the reason for the second interview was the detective's concern that the first interview may have been rendered inadmissible by the failure to obtain a written waiver.

At 12:35 p.m., the detective met defendant at the detention center and asked for a second interview at the police department. Defendant responded, "I'm not supposed to talk to anyone until tomorrow." When asked who had told him that, defendant responded by handing the detective the business card of a public defender who had seen him earlier that morning.

The detective asked if the public defender was representing him; defendant stated he did not know. The detective asked if he had filled out any paperwork; defendant acknowledged he had signed something but did not know what it was. The detective then asked defendant to go with him to the police department anyway because his parents would be there.

While driving to the department, defendant spontaneously stated that he was willing to speak with the detective but did not want to do so with his parents present. The detective later relayed this request to defendant's parents.

Upon arrival, defendant had a private conversation with his parents. When the detective returned, defendant's mother stated that she had been contacted by the public defender's office. She was told that the office was unsure if it would be representing defendant, but would make the decision the next day. The detective replied that, regardless of the public defender's decision, the court would appoint an attorney to represent her son "throughout this situation." During this pre-interview discussion, neither his parents nor defendant expressed concern about speaking with an attorney before the interview or about proceeding with the interview.

The detective asked if he could conduct the interview. Defendant's mother responded, "Well, you interviewed him once, that would be fine." Defendant affirmed that the interview was "all right" with him. The detective again advised defendant of his rights. Defendant, his mother, and his father verbally acknowledged their understanding of those rights and their agreement to waive them. Each again recorded their agreement by signing individual waiver forms.

The detective provided a Juvenile Interview Waiver form to memorialize the waiver of defendant's right to his parents' presence. Defendant's mother read the waiver form, voiced her agreement, and signed it. Defendant's stepfather initialed his agreement. Defendant read the form but was not asked to sign it. He did, however, verbally agree, in his parents' presence, to talk to the detective without his parents being present.

After another period of private family time, the detective re-entered the room and requested permission to begin the interview. The parents gave their permission and left

the room. Following an oral interview, during which time lunch was provided, defendant was asked to prepare another written statement. He did so, and the interview concluded at 3:30 p.m.

At the detective's request, defendant closed his statement with a written acknowledgement that no threats or promises had been made by police since his arrest twelve hours earlier.

### A.

■ Defendant argues that his second statement was taken in violation of § 19–2–511 of the Colorado Children's Code. Specifically, although he does not dispute that he waived parental attendance at his interrogation, defendant argues that because his assent was not documented on the waiver form by his signature, the waiver was invalid. Thus, we must decide whether § 19–2–511 requires that a written waiver of parental presence be signed. We conclude that it does not.

■ When called upon to interpret a statute, we must construe it in a manner that gives effect to the legislative purpose underlying its enactment. *M.S. v. People*, 812 P.2d 632 (Colo.1991). Thus, we look first to the plain language of the statute itself. *People v. District Court*, 713 P.2d 918 (Colo.1986). Our review is de novo. *See People v. Luke*, 948 P.2d 87 (Colo.App.1997).

Section 19–2–511(1), C.R.S.1999, of the Colorado Children's Code states in relevant part that:

> No statements or admissions of a juvenile made as a result of the custodial interrogation of such juvenile by a law enforcement official ... shall be admissible in evidence against such juvenile unless a parent ... of the juvenile was present at such interrogation and the juvenile and his or her parent ... were advised of the juvenile's right[s].... ··

The General Assembly adopted the parental presence rule to further its purpose of strengthening family ties, § 19–1–102, C.R.S. 1999, and to guard against invalid waivers of important constitutional rights by minors acting without assistance. *See Nicholas v. People*, 973 P.2d 1213 (Colo.1999).

The rule sets forth initial safeguards for the interrogation process to ensure that the juvenile defendant understands the benefits of his rights guaranteed under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the consequences of waiver. *See Nicholas v. People, supra.*

Specifically, as is relevant here, the statute requires that the juvenile's parent be present when he is advised of his rights and interrogated by police, *see People in Interest of G.L.*, 631 P.2d 1118 (Colo.1981), and it operates as a per se rule of exclusion whenever the juvenile has not been afforded the special assistance required. *Nicholas v. People, supra.*

However, this section also recognizes an additional right to waive the presence of a parent or interested person. Notwithstanding the provisions of § 19–2–511(1), § 19–2–511(5), C.R.S.1999, provides that:

> [T]he juvenile and his or her parent ... may expressly waive the requirement that the parent ... be present during interrogation of the juvenile. This express waiver shall be in writing and shall be obtained only after full advisement of the juvenile's rights prior to the taking of the custodial statement by a law enforcement official. If said requirement is expressly waived, statements or admissions of the juvenile shall not be inadmissible in evidence by reason of the absence of the juvenile's parent ... during interrogation.

Thus, the statute requires that, to be sufficient, a waiver of the right to parental attendance must be express, in writing, and obtained after a *Miranda* advisement.

Here, it is undisputed that the waiver was obtained after a thorough advisement of defendant's rights.

It was also undisputed that defendant made verbal requests that his parents not be present during an interrogation and that his parents knew of his desire; that defendant, his mother, and stepfather read the waiver form; that his mother signed and his stepfather initialed the waiver form in defendant's presence; and that defendant verbally ac-

knowledged, in the presence of his parents, his assent to the waiver.

This record unequivocally established that defendant's and his parents' waiver of the right to parental attendance was express. "Express" communication is one that is clearly and unmistakably communicated; it is directly stated. *Black's Law Dictionary* 61 (7th ed.1999).

The statute, however, mandates that "the express waiver" be in writing. Although the waiver was documented on a written form, defendant interprets this provision to require a signature by all parties assenting to waiver. The People argue, to the contrary, that the plain language of the subsection demands a memorial writing, but does not require a signature. We agree with the People.

A writing memorializes verbal communications, thoughts, and actions. *Blacks Law Dictionary* 1603 (7th ed.1999) (any intentional recording of words in a visual, tangible form). A signature authenticates a writing. Restatement (Second) of Contracts § 134 (1979) (the signature to a memorandum may be any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer). Thus, the requirement for a writing is separate and distinct from a signature requirement. *See* § 2–4–401(17), C.R.S.1999 ("in writing" includes any representation of words, letters, symbols, or figures; but this provision does not affect any law relating to signatures).

▇ Moreover, we are not to presume that the General Assembly chose its words idly and with no intent that meaning should be given to its precise language. *See McMillin v. State*, 158 Colo. 183, 405 P.2d 672 (1965); *see also* § 2–4–101, C.R.S.1999 (words shall be construed according to common usage; words that have acquired a technical or particular meaning whether by legislative definition or otherwise shall be construed accordingly).

Thus, if the General Assembly had intended to require signatures on the juvenile waiver form, as defendant argues, it would have done so. *Compare* § 16–19–126, C.R.S.1999 (extradition waiver by executing or subscribing a writing); § 18–1–405(4), C.R.S.1999 (waiver of statutory right to speedy trial and agreement to a continuance must be signed by the defendant); § 19–2–505, C.R.S.1999 (search warrant affidavit may include sworn testimony reduced to writing and signed under oath); § 15–11–502, C.R.S.1999 (a will must be reduced to writing and signed by the testator, or by someone in his presence and under his direction); § 38–22–109(2), C.R.S. 1999 (lien statement shall be signed, sworn, and notarized); § 38–10–108, C.R.S.1999 (contracts for interest in land must be evidenced by signed memorandum); § 19–1–103(28.5), C.R.S.1999 ("Consent Form," means a verified written statement, signed and notarized); and § 13–80–113, C.R.S.1999 (to be evidence of new or continuing contract, an acknowledgment or promise must be signed and in writing) *with* § 13–10–114, C.R.S.1999 (defendant in municipal court must make written demand for jury trial); § 24–10–109, C.R.S.1999 (Colorado Governmental Immunity Act requires written notice of claim be filed with public entity); § 12–61–808, C.R.S.1999 (broker's agency relationship with seller must be disclosed to buyer in writing).

▇ Although we conclude that the statute does not require a signature, we do note that, to be effective, the required writing must in some manner be attributable to the person against whom it is to be enforced, here, defendant. Defendant's signature on the document would obviously have been the most direct means to demonstrate this. However, a signature is not the only way for a person to acknowledge or ratify a written document, and here, the actions and conduct of defendant unequivocally demonstrated his acknowledgement of the written waiver as his own.

The preparation of the written waiver was triggered specifically because defendant requested not once, but twice, that his parents not be present during his interrogation. Furthermore, the record is clear that defendant read the document after it was prepared, was present when his parents signed it, and verbally acknowledged the written waiver in the presence of his parents. Moreover, here, defendant does not argue that he did not waive his parents' presence, but only

that the absence of his signature on the written waiver, in and of itself, invalidated that waiver.

### B.

The trial court suppressed defendant's first statement because it was taken in violation of § 19–2–511 when the parties' express waiver of parental attendance was not written. However, relying upon *People v. Gennings,* 808 P.2d 839 (Colo.1991), the trial court also concluded that the first statement was voluntary. Defendant does not challenge the voluntariness of his second statement.

■ Under *Miranda v. Arizona, supra,* if a defendant is either not advised of his rights, or fails to make a knowing and intelligent waiver of those rights, any statements he makes are generally inadmissible in a criminal case against him. The warnings incorporated in a *Miranda* advisement are codified, in the juvenile context, pursuant to § 19–2–511. *See People in Interest of J.C.,* 844 P.2d 1185 (Colo.1993).

■ The remedy for a *Miranda* violation, including a § 19–2–511 violation, is suppression of the statements obtained. *See People v. T.C.,* 898 P.2d 20 (Colo.1995). However, the fruits doctrine, as enunciated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), requires suppression only if the statement illegally obtained was constitutionally infirm, *i.e.,* if it was involuntary. *People v. T.C., supra.* Thus, if the suspect's initial, suppressed statements were voluntary, then any later Mirandized statements are admissible as long as they were knowingly and voluntarily made. *See People v. Mendoza–Rodriguez,* 790 P.2d 810 (Colo.1990).

### 1.

■ Defendant first argues that, contrary to the trial court's determination, his first statement was involuntary. In support, defendant claims that he was not afforded the opportunity to confer with counsel prior to the interrogation; that the method of interrogation constituted the use of psychologically coercive tactics; and that the court failed to consider his parents' absence from the first interrogation. We are not persuaded.

■ A statement is constitutionally voluntary "as long as some form of coercive police activity does not play a significant role in inducing the statement." *People v. Hamilton,* 831 P.2d 1326, 1332 (Colo.1992).

■ The voluntariness determination should be made after considering the totality of the circumstances surrounding the making of the inculpatory statement, *see People v. Gennings, supra,* including, in the context of a juvenile offender, the presence or absence of his parents. *People v. T.C., supra.*

■ The trial court's findings on the fact of voluntariness are entitled to deference by this court and will not be overturned if supported by competent evidence in the record. *See People v. McIntyre,* 789 P.2d 1108 (Colo. 1990).

Here, the record supports the trial court's findings that defendant was afforded an opportunity to confer with counsel. Defendant and his parents were given a thorough *Miranda* advisement, verbally and in writing, which included his right to consult with an attorney. All parties acknowledged, verbally and in writing, that they understood this right. There is no evidence that defendant or his parents had questions or concerns before they chose not to invoke, but to waive the right.

Next, relying on *People v. Gennings, supra,* defendant argues that the detective's method and style of interrogation was psychologically coercive. We disagree.

In *Gennings,* the examiner's use of threats and a "soft technique" were determined by the court to be psychologically coercive. However, the examiner's conduct did not play so significant a role in overbearing the defendant's will as to have caused the defendant's statement to be involuntary. The supreme court concluded that the "soft technique," absent the outright threats, did not constitute improper coercion.

Here, it is undisputed that the detective did not make promises or threats at any time

during defendant's custody. Moreover, the only statement possibly indicative of the detective's "soft technique,"—that if defendant were responsible for the murders it would be "extremely tough on him to live with"—was made after defendant had agreed to tell him what had happened.

Defendant's contention to the contrary notwithstanding, the trial court, in its extensive findings of fact, did consider the absence of defendant's parents from his interrogation. In making its determination to suppress the first statement, the court noted, and defendant does not dispute, that defendant and his parents had expressly waived their right to parental attendance at defendant's first interrogation.

### 2.

■ If an initial statement is involuntary, the court must determine whether sufficient attenuation between the constitutional violation and the evidence sought to be introduced at trial has removed the taint of the illegality. *See People v. Mendoza–Rodriguez, supra.*

Defendant contends that, here, there was insufficient attenuation between his first statement and his second admission. However, because we have found record support for the trial court's determination that the first statement was voluntary, we do not address this argument.

### C.

Finally, defendant argues that his second statement should have been suppressed because the interrogation continued after he had invoked his right to counsel. We disagree.

■ If the desire for counsel is presented sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney and no ambiguity or equivocation exists, all questioning must cease until the person can consult counsel or the accused voluntarily reinitiates conversation. *People v. Romero,* 953 P.2d 550 (Colo.1998).

■ Whether an accused has invoked the right to counsel is an objective inquiry and requires a consideration of whether the accused's statement "can reasonably be construed as an expression of a desire for the assistance of an attorney." *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371 (1994).

■ Here, defendant asserts that he invoked his right to counsel when he told the detective he had spoken with a public defender, showed him counsel's card, and reported that he had signed what was presumably a request for a determination of indigency form. However, the fact that a defendant executed a financial eligibility form and the fact that a defendant was interviewed by a member of the public defender's office does not constitute an unambiguous invocation of the right to counsel. *People v. Benjamin,* 732 P.2d 1167 (Colo.1987); *see also People v. Vigoa,* 841 P.2d 311 (Colo.1992) (defendant's request for appointment of counsel, by filling out application form, was not an invocation of the right to counsel).

■ Defendant also claims that his mother's expression of concern that the public defender might not represent her son similarly invoked his right to counsel. However, when the detective responded that, regardless of the public defender's decision, the court would consider their financial situation and, if necessary, appoint an attorney to represent defendant "throughout this situation," the mother did not pursue the conversation.

We conclude, under the totality of circumstances, *see People v. D.F.,* 933 P.2d 9 (Colo. 1997), that the mother's statements simply indicated her concern how, because of the family's financial circumstances, legal representation could be obtained and were not a clear assertion of the right to counsel. *Davis v. United States, supra. See Lord v. Duckworth,* 29 F.3d 1216 (7th Cir.1994) (suspect's remark, "I can't afford a lawyer but is there any way I can get one?" held not a clear request for counsel); *United States v. Doe,* 60 F.3d 544 (9th Cir.1995) (statement by juvenile's mother that "maybe he ought to see an attorney" held not clear and unambiguous); *see also Kelly v. State,* 621 S.W.2d 176 (Tex.Crim.App.1981) (defendant's request for

mother to get him an attorney in the presence of police officer who heard such request is not sufficient to invoke his right to counsel).

The trial court's rulings denying the People's request for a jury instruction on complicity and determining that consecutive sentences were not required are disapproved. Otherwise, the judgment is affirmed.

Judge NEY concurs.

Judge ROY concurs in part and dissents in part.

Judge ROY concurring in part and dissenting in part.

Although I concur in the majority's disapproval of the trial court rulings challenged by the People, I respectfully dissent with respect to defendant's cross-appeal.

I conclude that the trial court erred in failing to suppress an incriminatory statement defendant made to the police because the statement was taken in violation of § 19–2–511, C.R.S.1999.

Section 19–2–511 states in pertinent part: (1) No statements or admissions of a juvenile made as a result of the custodial interrogation of such juvenile by a law enforcement official concerning delinquent acts alleged to have been committed by the juvenile shall be admissible in evidence against such juvenile unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation and the juvenile and his or her parent, guardian, or legal or physical custodian were advised of the juvenile's right....

. . . .

(5) Notwithstanding the provisions of subsection (1) of this section, the juvenile *and* his or her parent, guardian, or legal or physical custodian may expressly waive the requirement that the parent, guardian, or legal or physical custodian be present during interrogation of the juvenile. *This express waiver shall be in writing and shall be obtained only after full advisement of the juvenile and his or her parent, guardian, or legal or physical custodian of the*

*juvenile's rights prior to the taking of the custodial statement by a law enforcement official.* If said requirement is expressly waived, statements or admissions of the juvenile shall not be inadmissible in evidence by reason of the absence of the juvenile's parent, guardian, or legal or physical custodian during interrogation .... (emphasis added)

When construing a statute, a court must give effect to the intent of the General Assembly and adopt the construction that best effectuates the purpose of the statutory scheme. *M.S. v. People,* 812 P.2d 632 (Colo. 1991). To determine intent, a court should look first to the language of the statute and give the words their ordinary meaning. *People in Interest of G.W.R.,* 943 P.2d 466 (Colo. App.1997).

The supreme court construed and applied § 19–2–511 in *Nicholas v. People,* 973 P.2d 1213 (Colo.1999). In that case, citing 2A N.J. Singer, *Sutherland Statutory Construction,* § 47.23 at 217 (5th ed.1992), the court held that the statute was to be strictly construed. The court also recognized that the General Assembly had instituted the parental presence rule out of a recognition that children require additional protection and assistance.

There are, of course, several reasons for requiring that an act be "in writing," the primary one being to resolve any future disputes as to whether the act, or any terms or conditions associated with it, was performed. Another reason, in my view, is to impress on the party acting that the act is important, may have serious consequences, and needs to be formalized or ritualized.

In my view, when, as here, the statute requires that a person's act "shall be in writing", the writing must, by some means, be the writing of the person acting. Therefore, it must be a writing of, or attributable to, the defendant by virtue of the fact that it is written, signed, acknowledged, or ratified by the defendant as his or her own.

I recognize that some statutes requiring a writing also require, by additional language, that the writing be signed or subscribed by the person against whom it is to be enforced. *See, e.g.,* § 18–1–405(4), C.R.S.1999 (waiver

of the statutory right to speedy trial and agreement for a continuance signed by the defendant). Based, in part, on such statutes, the majority concludes that the requirement of a writing is separate from the requirement of a signature. I would conclude that the separate signature requirement is a redundancy in most, if not all, instances.

Alternatively, the majority concludes that the writing is attributable to the defendant based largely on the surrounding circumstances of its preparation and the fact that the defendant does not deny that he wanted to waive the presence of his parents. However, the only evidence from which it can be argued that the writing is attributable to the defendant is that he saw the form after it was signed by his mother, was not asked any questions concerning it, and made no comments about it. That is clearly insufficient.

The defendant did not dispute in the trial court, or on appeal, that he did not want his parents present during any interrogation, and so stated. The only issue presented is whether his waiver of his parents' presence was adequate under the statute. I conclude it was not adequate for the reasons stated.

I am cognizant that some will view the statute as a "hyper-technicality" under the circumstances of this case in light of the fact that the defendant does not deny that he orally waived his right to have his parents present, and did not want them to be present, during the interrogation. If the statute is a "hyper-technicality," it is the creation of the General Assembly. I am also aware that the officers made a good faith effort, with some slight of hand, to comply with a new statute with which they were unfamiliar at the time of the first statement. However, I am concerned that the majority's opinion will, at best, dilute what I perceive to be the plain meaning of the phrase "shall be in writing" or, at worst, render the phrase meaningless.

I would reverse and remand for a new trial.