**Jeron GRANT, Petitioner,**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

No. 00SC799.

Supreme Court of Colorado, En Banc.

June 3, 2002.

Rehearing Denied July 1, 2002. *

* Justice HOBBS, Justice MARTINEZ and Justice BENDER would grant the Petition.

David S. Kaplan, Colorado State Public Defender, Cynthia Camp, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

Ken Salazar, Attorney General, Katherine A. Hansen, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

We granted certiorari in *People v. Grant*, 30 P.3d 667 (Colo.App.2000), to interpret the waiver provision of section 19–2–511, 6 C.R.S. (2001) ("juvenile statements statute").[1] Seventeen-year-old Jeron Grant spoke with police about a double homicide while his parents waited in a nearby room. Under the statute, such interview is permissible only when the juvenile and his parents expressly waive in writing the statutory requirement of parental presence. Grant's parent signed a waiver, but Grant did not. The statutory phrase "[t]his express waiver shall be in writ-

---

**1.** We granted certiorari specifically on the following issue:

Whether [Petitioner's] second incriminating statement was taken out of his parent's presence and without a valid waiver in violation of section 19–2–511, 6 C.R.S. (2000), of the Children's Code; the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and Article II, sections 1, 18, and 25 of the Colorado Constitution.

We address only the first basis, section 19–2–511, because we previously resolved these constitutional issues in *Nicholas v. People*, 973 P.2d 1213 (Colo.1999).

ing" in subsection 19–2–511(5) does not direct whether the juvenile must sign such waiver, and we therefore find it ambiguous. After resorting to the tools of statutory construction, we conclude that the legislature never intended written *unsigned* waivers to be conclusively ineffective. In this case, where the waiver was in writing, bore the signature of a parent, was obtained after full advisement, and was supported by ample evidence that the juvenile consented, we determine that the statutory mandate was satisfied. We therefore affirm the judgment of the court of appeals.

## I. Facts

Police arrested Jeron Grant in connection with the murder of two teenage boys. Because Grant was a juvenile, the officers awaited the arrival of his parents at the police station before interviewing him. When Grant's mother and stepfather arrived, the officers explained the reasons for Grant's arrest and requested permission to question him about the murders. They advised Grant and his parents of the juvenile's *Miranda* rights. On a printed "Fact Sheet," the officers filled in relevant information, pointed out the *Miranda* rights that were printed at the bottom, and had both Grant and his parents sign the form after they indicated their understanding.

The officers then began interviewing Grant who denied committing the murders and instead blamed the crime on an individual named "Quick." One Officer, Detective Crouch, told Grant he did not believe the story and asked Grant why he was lying. Shortly thereafter, Grant asked to speak with the officer alone. Crouch asked Grant's parents for their consent, which they gave verbally, but not in writing. The parents left the interview room and waited across the hall.

Crouch resumed the interview with Grant; however, the juvenile continued to deny his involvement. He accepted Crouch's offer to take a polygraph test. Crouch and Grant then moved into the polygraph room while Grant's parents moved into an adjoining room where they could watch. Before the polygraph started, Crouch told Grant, "You

don't really want to waste my time with this [the polygraph], do you? You know I know the truth. Why don't you come clean?" At this point Grant broke down in tears and told Crouch that he was afraid of going to jail.

Crouch asked Grant if he was ready to relate what really happened, and Grant responded in the affirmative. Crouch told Grant that if he was responsible for the boys' deaths, it would be "extremely tough on [Grant] to live with." At that point, Grant admitted his previous version of events was "a lie." At Crouch's request, Grant wrote out a statement and signed it. The statement implicated Grant in the murders. During these events, Grant's parents remained in the adjoining room where they could see, but not hear. Crouch took Grant's written statement to the parents who signed it without reading its contents. The officers then led Grant back to the initial interview room where his parents joined him; the officers later transferred Grant to Zebulon Pike Juvenile Detention Center.

At trial, the judge suppressed this statement as rendered in violation of the juvenile statements statute, *see* § 19–2–511, because it was taken outside the presence of Grant's parents and absent a written waiver. That decision is not at issue in this proceeding.

After the officers took Grant to the detention center, Crouch learned of changes to the juvenile statements statute that required a written waiver for interviews conducted outside the presence of a juvenile's parents. He decided to reinterview Grant, this time in compliance with the statute. Crouch had his office prepare a written waiver form, and he made arrangements for Grant and his parents to return to the station. He did not tell them the reasons for this second interview.

When Crouch arrived at the center to pick up Grant for the second interview, Grant showed the detective the business card of a public defender and told him, "I'm not supposed to talk to anyone until tomorrow." Crouch asked whether the public defender represented him; Grant responded that he did not know, but that he had "signed some-

thing." [2] Crouch told Grant to "go ahead and come with us down to the [police station]," and that, "his folks would be there." Grant complied and allegedly told the officers during the drive that he would consent to the second interview, but only if his parents were not present.

When the parties arrived at the police station, Grant and his parents met alone in the interview room for several minutes to discuss "a family matter." Crouch then entered and requested permission to conduct the second interview.

When Crouch received the parents' verbal consent, he provided them with a second "Fact Sheet" containing the written *Miranda* warnings. He again explained those rights and had all three of them initial the appropriate space on the form to signify their understanding. Crouch then presented a form entitled "Juvenile Interview Waiver." He asked Grant's mother to read it, and if she agreed, to sign it. She read and signed the waiver. Grant's stepfather initialed the form. Grant looked at the form, but was not asked to, nor did he, sign it. There was, in fact, no space on the form for his signature. At that time, however, he verbally agreed to an interview conducted outside his parents' presence.

Crouch's second interview with Grant lasted a few hours. At the end, Grant wrote out a statement that was substantially similar to his earlier statement but contained slightly more detail. The admissibility of this statement is at issue here.

In a written order, the trial judge denied Grant's motion to suppress the second statement finding that it did not run afoul of the Sixth Amendment.[3] In a motion to reconsider, defense counsel argued that the second statement should be suppressed based solely on the fact that Grant did not sign the waiver form and that without his signature, the document was invalid under the statute. The trial court rejected this argument finding that the waiver complied with the intent of

the statute and that such waiver need not be signed by both the juvenile and the parents. A jury acquitted Grant of first-degree murder, but convicted him of accessory to murder and accessory to manslaughter.

[1] The court of appeals affirmed. The court noted that the statute requires all waivers to be "in writing," but that it does not specify that both the parents and the juvenile must affix their signatures to such writing. The court went on to reason that a "requirement for a writing is separate and distinct from a signature requirement" in Colorado's statutory law. *Grant*, 30 P.3d at 673 (citing § 2–4–401(17), 1 C.R.S. (1999) (" 'Written' or 'in writing' includes any representation of words, letters, symbols, or figures; but this provision does not affect any law relating to signatures.")). After listing several statutes that specifically require signatures as part of a writing, the court concluded that the juvenile statements statute contained no such requirement. Ultimately, so long as the written waiver was "attributable to the person against whom it is to be enforced," the court ruled that such waiver was valid and, therefore, Grant's second statement was properly admitted. *Grant*, 30 P.3d at 673. We review a lower court's statutory interpretation de novo. *Fogg v. Macaluso*, 892 P.2d 271, 273 (Colo.1995).

## II. Statutory Interpretation

[2–7] This court follows a well-worn path in interpreting our state's statutes. "Our primary task in construing a statute is to give effect to the intent of the General Assembly.... To discern that intent, a court should look first to the plain language of the statute." *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991). When we determine that statutory language is ambiguous, we may look to rules of statutory construction and to the legislative history as indications of the legislature's intent. *Rodriguez v. Schutt*, 914 P.2d 921, 925 (Colo.1996). We give effect both to the spirit and to the

---

**2.** Grant had signed an "Application for Court Appointed Counsel."

**3.** The defense filed one pretrial motion to suppress both statements. After a hearing, the trial

judge granted the motion in part and denied in part, suppressing the first statement, but refusing to suppress the second one.

intent of the legislators in enacting the statute. *Hall v. Walter*, 969 P.2d 224, 229 (Colo. 1998). "Although we must give effect to the statute's plain and ordinary meaning, the General Assembly's intent and purpose must prevail over a literalist interpretation that leads to an absurd result." *Lagae v. Lackner*, 996 P.2d 1281, 1284 (Colo.2000). Thus, we try to ascertain the intent of the general assembly in promulgating the juvenile statements statute and the waiver provision. When we deem the statute itself to be ambiguous, we look to statutory interpretation tools to aid us in the analysis.

Here, the statute requires that a juvenile be accompanied by a parent when making statements to the police, unless the juvenile and parent expressly waive that right. Specifically, the statute reads in relevant part:

(1) No statements or admissions of a juvenile made as a result of the custodial interrogation ... shall be admissible in evidence against such juvenile unless a parent ... was present at such interrogation....

....

(5) [T]he juvenile and his or her parent ... may expressly waive the requirement.... *This express waiver shall be in writing* and shall be obtained only after full advisement ... of the juvenile's rights prior to the taking of the custodial statement....

§ 19–2–511, 6 C.R.S. (2001) (emphasis added). The question before this court is whether the written waiver signed by Grant's mother and initialed by his stepfather, but not signed by Grant himself, satisfies this statutory requirement. We hold that it does.

### III. The Statutory Language Is Ambiguous

Of his own accord, but with the undisputed consent of his parents, Grant decided to reveal his involvement in the murders outside his parents' earshot. In 1996 the legislature amended the Children's Code to provide for precisely this situation; it added a waiver provision. *See* ch. 283, sec. 1, § 19–2–511(5) 1996 Colo. Sess. Laws 1595, 1635–36. The new provision directs that "[t]his express waiver shall be in writing." § 19–2–511(5). Resorting to the plain meaning of the statutory language does not answer whether the general assembly intended "in writing" to require a signature to be effective.

On one hand, the general assembly frequently uses "in writing" in Colorado's statutes in a way that does not assume it encompasses signatures. For example, in the field of music copyrights, the legislature chose the following language: "A contract for the payment of the royalties by a proprietor to a copyright owner or society shall: (a) Be *in writing;* (b) Be *signed* by the parties." § 6–13–103(4), 2 C.R.S. (2001) (emphasis added). A statute governing forcible entry and detainer directs, "The demand ... shall be made *in writing,* specifying the grounds of the demandant's right to the possession of such premises, ... and *shall be signed* by the person claiming such possession." § 13–40–106, 5 C.R.S. (2001) (emphasis added). These are two of a multitude of examples whereby the legislature has treated "in writing" as separate and distinct from a signature requirement. Indeed, interpreting the phrase "in writing" to assume a signed document renders superfluous the separate "signature" language used in the above examples, an interpretation we are to avoid. *See People v. Swain*, 959 P.2d 426, 432 (Colo. 1998) ("[I]nterpretations that render statutory provisions superfluous should be avoided.").

On the other hand, Colorado statutes often contain the phrase "in writing" by itself, without accompanying "signature" language. In some of those instances, the legislature arguably intended the writings be signed. For example, section 4–2.5–309(5), 2 C.R.S. (2001), provides, "The interest of a lessor of fixtures ... has priority ... if: ... (c) The encumbrancer or owner has consented *in writing* to the lease...." Surely, in this case, the "written" consent should bear the signature of the owner. Similarly, section 6–2–111(3), 2 C.R.S. (2001), directs, "If any person, ... *in writing* and under oath, submits to the attorney general a statement setting forth facts sufficient to constitute a prima facie case of violation of ... this article...." Again, it is difficult to conceive that the legislature would require a "writing" under

oath, but be indifferent as to whether that writing was signed.

At other times, however, a signature requirement is not necessarily implicit in instances when "in writing" appears alone. For example, in a statute governing unlawful telemarketing, the general assembly mandated, "The availability and terms of the return and refund privilege shall be disclosed to the consumer orally by telephone and *in writing* with any advertising or promotional material. . . ." § 6–1–304(2), 2 C.R.S. (2001) (emphasis added). Another example appears in the UCC, section 4–2–609(1), 2 C.R.S. (2001): "When reasonable grounds for insecurity arise with respect to the performance of either party, the other may *in writing* demand adequate assurance of due performance. . . ." (Emphasis added.) *See also* § 8–4–105(4), 3 C.R.S. (2001) ("Every employer shall at least monthly . . . furnish to each employee an itemized pay statement *in writing* showing the following . . . .") (in this and following quotations, emphases have been added); § 8–4–120(1), 3 C.R.S. (2001) ("Ascertain and disclose *in writing* to each migratory laborer, in a language in which the migratory laborer is fluent. . . ."); § 17–22.5–403(6), 6 C.R.S. (2001) ("[T]he state board of parole shall . . . modify the conditions of parole if circumstances then shown to exist require such modifications, which circumstances shall be set forth *in writing*, or revoke the parole and order the return of the offender to a place of confinement . . . ."); § 27–10.3–104(1)(b), 8 C.R.S. (2001) ("At the time of the assessment by the mental health agency, if residential services are denied, the mental health agency shall advise the family, *both orally and in writing*, of the appeal process available to them."). None of these examples would lead one necessarily to conclude that the writing must be signed.

◼ The legislature's varied use of the phrase "in writing" does not unequivocally answer whether a signature must accompany such writing. Where multiple interpretations are reasonable, we may find a statute's language is ambiguous. *State v. Nieto*, 993 P.2d 493, 502 (Colo.2000). Accordingly, we

conclude that "in writing" as used in this statute is ambiguous.

### IV. Statutory Construction

Legislative history is just one of several tools available to aid our resolution of ambiguous statutory terms. § 2–4–203, 1 C.R.S. (2001). We may also consider the "objective sought to be attained," and "[t]he consequences of a particular construction." *Id.*

The hearings in the legislative committees prior to the passage of the waiver provision at issue reveal that the provision was but a small part of a substantial overhaul of the Children's Code. Originally, the proposed amendment contained only the language, "Notwithstanding the provisions of subsection (1) of this section, the juvenile and his or her parent, guardian, or legal or physical custodian may expressly waive the requirement." Hearings on H.B. 96–1005 Before the House Committee on the Judiciary, 60th General Assembly, Second Regular Session (Jan. 25, 1996). With almost no debate, the provision passed the House Judiciary Committee in that form. *Id.*

In the Senate's judiciary committee, the provision received somewhat more attention. Hearings on H.B. 96–1005 Before the Senate Committee on the Judiciary, 60th General Assembly, Second Regular Session (Apr. 19, 1996). One committee member, advocating for the proposed amendment, noted that juveniles are frequently uncomfortable talking about their misdeeds, especially sexual crimes, in front of their parents and that the waiver was necessary to afford them the opportunity to cooperate with police, when the juvenile, together with his or her parents, decided to do so. *Id.*

A representative from the Colorado Criminal Defense Bar, testifying at the hearing, convinced the Senate's committee that, as it stood, the waiver provision appeared to allow police to interrogate a juvenile first, and then later garner the parent's consent. The committee accepted the Defense Bar's recommendation that the law require a *written* waiver be in place *prior* to the custodial interrogation.[4] *Id.*

---

4. The committee adopted the CCDB representa- tive's language in its entirety: "This express

This testimony suggests the "written waiver" language was an attempt to allay fears that police might undermine the waiver provision's purpose by securing the waiver only after they had already interrogated the juvenile. By ensuring the consultation with the parent took place *prior* to any interrogation, and with the parties' written consent to prove it, the legislature sought to safeguard juveniles from an uninformed, unprotected interrogation, while still affording them the opportunity to cooperate with police without exposing the juvenile's parents to the details of the crimes. The legislative history does not reveal any specific intent on behalf of the lawmakers to require, or not to require, a signature as part of the written waiver.

We have previously observed that the general assembly added this statute to the Children's Code to afford juveniles some shelter from the rigors of custodial interrogation. "[T]he purpose in enacting the [juvenile statements] statute is to ensure that a juvenile during police interrogation is advised and counseled concerning his or her Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel by someone whose interests are consistent with those of the child." *People v. S.M.D.*, 864 P.2d 1103, 1106 (Colo.1994); *see also People v. Raibon*, 843 P.2d 46, 50 (Colo.App.1992) ("[L]egislative purpose [of subsection (1)] is to provide to the minor an opportunity to consult with a parent or guardian before deciding whether to assert or to waive his or her Fifth Amendment rights."). The crux of the statute, then, is that the juvenile have access to an adult who will help safeguard the child's constitutional rights in a custodial interrogation context.

Based upon the cumulative intent of the statute, as reflected in its language and the legislative history, we conclude that the legislature never intended that waivers not signed by both the parent and the juvenile should be found invalid per se, thereby rendering subsequent statements inadmissible. Rather, the general assembly intended the writing to serve as evidence, physical proof that law enforcement actually afforded the juvenile an opportunity to consult with .an adult *before* the police undertook the juvenile's interrogation. We believe the general assembly also sought to ensure that the juvenile and parent were fully aware of the scope and content of the rights they were waiving and to impress upon them the importance of those rights.

The court of appeals ruled that the written document in this case satisfied the statute because it was "attributable" to the juvenile (and his parents, assumedly). We agree with this rationale. There exist a host of circumstances, in addition to or separate from signatures, that bear on the authenticity of a written document. We hold, therefore, that although it would clearly be preferable, an express, written waiver need not necessarily be signed in order to satisfy subsection (5) of section 19–2–511 so long as the circumstances surrounding that waiver clearly demonstrate that the child and parent agreed to waive their statutory rights.

### V. Application

We turn now to the circumstances that may bear on the reliability of a waiver under section 19–2–511(5). Certainly, signatures by both parent and juvenile would constitute strong evidence of the written waiver's credibility. Uncontroverted testimony that the juvenile verbally consented to the waiver, or audio or videotape with the same content, along with the signature of a parent, also would support the waiver.

However, a trial court may also examine the circumstances that purportedly gave rise to the waiver: for example, where, when, and at what stage in the proceedings the writing appeared; whether the juvenile and parent agreed to the writing simultaneously or separately; whether their consent was garnered in person; whether they were offered ample opportunity to consult; whether they did consult, privately or with the police present; whether the parties were aware that the written waiver was a statutory requirement; whether there existed any

waiver shall be in writing and shall be obtained only after full advisement of the juvenile and his or her parent, guardian, or legal or physical

custodian of the juvenile's rights prior to the taking of the custodial statement by a law enforcement official." *See* § 19–2–511.

evidence that signatures, if present, were coerced; and whether any other evidence supports or undermines the validity of the waiver. This is clearly not an exhaustive list, as each case will have its own particularities bearing on the credibility of the waiver at issue. The trial court should examine all relevant circumstances bearing on the reliability of the written waiver and uphold it when appropriately supported.

 We are convinced that the written waiver in this case adequately recorded the intent of Grant and his parents to relinquish their statutory right to parental presence. Here, Grant's mother and stepfather were present before the interrogation began. They had ample opportunity to consult with him, and they did so. Detective Crouch explained the *Miranda* rights to Grant and his parents, twice, in fact. Both Grant and his parents signed a *Miranda* waiver. The statement Grant made was voluntary and in full compliance with his constitutional rights. The juvenile statements statute operated precisely as designed. We acknowledge that police failed to inform Grant or his parents of the statutory written waiver provision that necessitated the second interview. However, we also consider that there is no factual question whatsoever about whether Grant sought to waive this statutory right, or whether he disputed the contents of the waiver in any respect. Indeed, he insisted upon the interview outside the presence of his parents.

## VI. Conclusion

In sum, we decline to adopt a per se signature requirement. Written waivers under section 19–2–511(5) need not necessarily be signed by both the parent(s) and the juvenile so long as the circumstances surrounding the waiver support its reliability. We affirm the judgment of the court of appeals.

Justice HOBBS dissents, and Justice MARTINEZ and Justice BENDER join in the dissent.

Justice HOBBS, dissenting:

I respectfully dissent. The majority acknowledges that section 19–2–511(5) "requires that a juvenile be accompanied by a parent when making statements to the police, unless the *juvenile and parent* expressly waive that right." Maj. op. at 547. (emphasis added). I agree. The majority also acknowledges that the statute requires a written waiver to this effect. Maj. op. at 549. I agree. The majority then holds that the written waiver the parents, but not the juvenile, signed in this case effectively waived the juvenile's right under the statute to have a parent present during the police interrogation. Maj. op. at 550. I disagree.

The statute does not give effect to a waiver executed by a parent but not the juvenile. The statutory right to have a parent present during custodial interrogation is the juvenile's right to waive, and thus may not be waived solely by his parents on his behalf. *See* § 19–2–511(5), 6 C.R.S. (2001). Jeron Grant did not write the waiver, sign, or initial it. There are no indications on the face of this document that Jeron Grant adopted the waiver form as his own. Therefore, there is no juvenile express waiver in writing in this case.

## I.

### A. The Written Waiver Here Is Only The Parent's

The waiver in this case was not the juvenile's, regardless of whether or not he signed it. The written instrument the majority assumes to be the juvenile's waiver is plainly only a written parental waiver, not-as the majority acknowledges to be the law-a written juvenile *and* parental waiver. The instrument did not include a clear written statement that (1) the right to have a parent present during the interrogation is the juvenile's and (2) having been advised of this right, the juvenile expressly waives it.

The waiver form stated the following:

**JUVENILE INTERVIEW WAIVER**

I, <u>KATHY E. HOWELL</u>, his or ~~her~~KH parent/guardian/legal or physical custodian may expressly waive the requirement that

the parent/guardian/legal or physical custodian be present during interrogation of the juvenile.

This express waiver shall be in writing and shall be obtained only after full advisement of the juvenile and his or ~~her~~KH parent/guardian/legal or physical custodian of the juvenile's rights prior to the taking of the custodial statement by a law enforcement official.

If said requirement is expressly waived, statements or admissions of the juvenile shall not be inadmissible in evidence by reason of the absence of the juvenile's parent/guardian/legal or physical custodian during interrogation.

The waiver form next contained a line requesting the name and date of birth of the juvenile, which was apparently filled in by the police officer. Finally, the form contained a signature line for the "Person Signing the Waiver" and a line requesting the signing person's "Relationship" to the juvenile. Kathy E. Howell signed the form and stated her relationship to the juvenile as "mother."

Nowhere on the document does a space exist for the juvenile to indicate his acceptance or rejection of the waiver. This accords with the entire language and tenor of the document. It contemplates only a written parental waiver. The first line of the waiver form states, "I, KATHY E. HOWELL, *his parent* /guardian/legal or physical custodian *may expressly waive the requirement that the parent/guardian/legal or physical custodian be present during interrogation of the juvenile.*" (Emphasis added.) The clear and unequivocal purpose of this document was to obtain and record Kathy Howell's written waiver, not her son's.

The writing here does not comply with section 19–2–511(5). Where the statutory language is clear and unambiguous, "there is no need to resort to interpretive rules of statutory construction." *Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1218

(Colo.2002). "In construing statutory provisions, our obligation is not to make policy decisions but rather to give full effect to the legislative intent." *Farmers Ins. Exch. v. Bill Boom Inc.*, 961 P.2d 465, 469 (Colo.1998). We must ascertain and give effect to the intent of the General Assembly, not second guess its judgment. *Id.*

Here, the plain language of the statute is clear and unambiguous. A parent's presence [1] during custodial interrogation of a juvenile is mandatory. *Nicholas v. People*, 973 P.2d 1213, 1216 (Colo.1999). Statements or admissions of a juvenile obtained in violation of this rule are inadmissible. *See* § 19–2–511(1), 6 C.R.S. (2001). Section 19–1–511(5) and (6) contain two exceptions to this mandatory requirement: subsection (5) allows a parent *and* the juvenile to waive the parent's presence in writing, and subsection (6) provides a good faith and reasonable reliance exception when the juvenile makes a deliberate misrepresentation affecting the applicability of mandatory parental presence. Section 19–1–511(5) provides:

> Notwithstanding the provisions of subsection (1) of this section, *the juvenile and his or her parent* ... may expressly waive the requirement that the parent ... be present during the interrogation of the juvenile. *This express waiver shall be in writing* and shall be obtained only after full advisement of the juvenile and his or her parent.... If said requirement is expressly waived, statements or admissions of the juvenile shall not be inadmissible in evidence by reason of the absence of the juvenile's parent.

Section 19–2–511(6) provides:

> Notwithstanding the provisions of subsection (1) of this section, statements or admissions of a juvenile shall not be inadmissible into evidence by reason of the absence of a parent, guardian, or legal or physical custodian, if the juvenile makes any deliberate misrepresentations affecting the applicability or requirements of this section and a law enforcement official, acting in good faith and in reasonable reli-

---

1. I use the term "parent" in this dissent to refer to "parent, guardian, or legal or physical custodian" as set forth in section 19–2–511(5).

ance on such deliberate misrepresentation, conducts a custodial interrogation of the juvenile that does not comply with the requirements of subsection (1) of this section.

The section 19–2–511(6) exception is inapplicable to this case, and the plain language of section 19–2–511(5) is unambiguous. There must be an "express waiver" of the mandatory parental presence requirement by the "juvenile *and* his or her parent, guardian, legal or physical custodian," and it "*shall* be in writing." § 19–2–511, 6 C.R.S. (2001)(emphasis added). "The use of the term 'shall' indicates that the rule is mandatory." *Nicholas*, 973 P.2d at 1216.

The words that the waiver "shall be in writing" are plain and unambiguous: the juvenile and the parent's agreement to waive the juvenile's right to have the parent present during the interrogation must appear on the face of the written instrument. The court, in my view, should give effect to the "in writing" requirement's evident purpose: to protect juveniles who are subjected to police interrogation.[2]

The General Assembly enacted the parental presence rule because children require additional protection and assistance when confronted by police officers who are investigating them for criminal acts. *See Nicholas*, 973 P.2d at 1218–19; *People v. Legler*, 969 P.2d 691, 694 (Colo.1998)(stating that the purpose of the parental presence requirement was to provide additional and necessary assurances that the juvenile's Fifth Amendment right against self-incrimination will be afforded to him); *People v. Saiz*, 620 P.2d 15, 19–20 (Colo.1980); *People v. Maes*, 194 Colo. 235, 237, 571 P.2d 305, 306 (1977)(holding that "the clear purpose of the Children's Code is to afford a special protection to a juvenile who is in police custody because of alleged criminal acts"). The parental presence rule guards against invalid waivers of important constitutional and statutory rights by minors acting without assistance. *Nicholas*, 973 P.2d at 1218 ("The plain language of

this statutory mandate reflects the General Assembly's recognition that juveniles generally lack the capacity to make important legal decisions alone."); People in the *Interest of G.L.*, 631 P.2d 1118, 1120 (Colo.1981)("The purpose of [the] section ... is to provide a child with parental guidance during police interrogation, and to ensure that any waiver of the child's Fifth Amendment rights against self-incrimination and Sixth Amendment right to counsel will be made knowingly and intelligently."); *Saiz*, 620 P.2d at 19–20.

The written waiver requirement impresses upon the parent *and* the juvenile (1) the importance of the juvenile's parental presence right, and (2) alerts both parent and juvenile that waiver of this right can have serious consequences. The evident statutory purpose underlying a properly written juvenile and parental waiver is to: (1) solemnize the occasion of the waiver, (2) remind the police that the right belongs to the juvenile, and (3) provide evidentiary proof of the opportunity to review the waiver and the waiver's validity.

The absence of a juvenile's parents during police interrogation is a significant legal event, of importance equal to or greater than other legal events requiring signatures. *See, e.g., People v. Gall*, 30 P.3d 145, 158 (Colo.2001)(holding that search warrant forms must be signed or sworn to by the affiant); § 18–1–405(4), 6 C.R.S. (2001)(waiver of statutory right to speedy trial and agreement to continuance must be signed by the defendant); § 15–11–502, 5 C.R.S. (2001)(a will must be reduced to writing and signed by the testator); § 38–10–108, 10 C.R.S. (2001)(contracts for interest in land must be evidenced by signed memorandum).

In my view, the written waiver must clearly call for the parent's and juvenile's assent to it, and the juvenile as well as the parent must adopt the writing as their own. This would most usually occur by the juvenile and the parent both signing the instrument. However, we need not examine the absence of Jeron Grant's signature here, because the

---

**2.** *See People v. Grant*, 30 P.3d 667, 677 (Colo. App.2000) (Roy, J., concurring in part and dissenting in part)("However, I am concerned that the majority's opinion will, at best, dilute what I

perceive to be the plain meaning of the phrase 'shall be in writing' or, at worst, render the phrase meaningless.").

waiver is invalid on its face. The language of the instrument does not contain a clear written statement that (1) the right to have a parent present during the interrogation is the juvenile's and (2) having been advised of this right, the juvenile expressly waives it.

In my view, the majority's discussion of a signature requirement is beside the point. Maj. op. at 547–48. The instrument itself fails as an effective written waiver under section 19–2–511(5).[3] The court need not reach the signature issue.

## B.

### A Totality Of The Circumstances Test Is Inapplicable

The majority analyzes the totality of the circumstances surrounding the mother's written waiver and holds that the written waiver is the juvenile's waiver as well. Maj. op. at 549–50. I disagree. First, a totality of the circumstances analysis is inapplicable to this case. Second, the facts demonstrate that the police obtained the parent's written waiver but only the juvenile's oral waiver.

The majority utilizes a totality of the circumstances test without applying that appellation to the test it creates. The majority states, "[A] trial court may also examine the circumstances that purportedly gave rise to the waiver.... The trial court should examine all relevant circumstances bearing on the reliability of the written waiver and uphold it when appropriately supported." Maj. op. at 549. The majority lists a number of factors to consider. The majority then concludes that the "written waiver in this case adequately recorded the intent of Grant and his parents to relinquish their statutory right to parental presence." Maj. op. at 550.

In my view, a totality of the circumstances test is inapplicable. In *Nicholas*, we held that the statute did not create a totality of the circumstances test, rather section 19–2–

511 mandated a per se rule of inadmissibility. *Nicholas*, 973 P.2d at 1219. "In Colorado, through section 19–2–210, the legislature has enacted an explicit statutory rule of evidence that operates as a per se or automatic rule of exclusion in the absence of the procedural safeguards set forth in that section." *Id.* at 1220 (section 19–2–210 is currently codified at section 19–2–511). We expressly rejected a totality of the circumstances test in substitution for the express statutory language:

> The first is an after-the-fact review of the totality of the circumstances to determine whether a juvenile's waiver was knowing, intelligent, and voluntary. The second is the adoption of initial safeguards and a rule of exclusion whenever the juvenile has not been afforded the special assistance required. This "per se" approach automatically excludes a waiver based on the absence of certain circumstances i.e., on the absence of the requisite procedural safeguards. One reason for the adoption of a per se rule is to ensure more consistent application than is possible with a totality of the circumstances test.

*Id.* at 1219 (citation omitted).

In 1999, the General Assembly responded to the *Nicholas* decision in two ways. It added section 19–2–511(6) to address situations, such as the one in *Nicholas*, where a juvenile deliberately misrepresented his age or some other material fact-which the police then relied on in good faith-to conclude that the mandatory parental presence requirement did not apply to the case. Ch. 258, sec. 1, § 19–2–511, 1999 Colo. Sess. Laws 1017.

Significantly, the legislature also amended section 19–2–511(2) to include a totality of the circumstances test, but—by its express terms—this test applies only when the juvenile makes a knowing, intelligent, and voluntary waiver of rights *and* the juvenile was emancipated; a runaway from another state of sufficient age and understanding, eighteen

---

**3.** Were it necessary to reach the signature issue, I would conclude that the General Assembly intended that a police-prepared written waiver must be signed, initialed, or in some other manner expressly adopted by both the parent and the juvenile as their own. The majority demonstrates that the General Assembly has used "in writing" in some circumstances to include the requirement of a signature and sometimes has stated a signature requirement, in addition. Maj. op. at 547. Because the legislature intended the statute here to protect the juvenile, we should construe the statutory language in favor of requiring the juvenile's formal adoption of the document in some manner.

years or older at the time of interrogation, or misrepresented his or her age to be over eighteen:

> 19–2–511 Statements. (2)(a) Notwithstanding the provisions of subsection (1) of this section, statements or admissions of a juvenile ~~shall not be admissible~~ MAY BE ADMISSIBLE in evidence, ~~by reason of~~ NOTWITHSTANDING the absence of a parent, guardian, or legal or physical custodian, if THE COURT FINDS THAT, UNDER THE TOTALITY OF THE CIRCUMSTANCES, THE JUVENILE MADE A KNOWING, INTELLIGENT, AND VOLUNTARY WAIVER OF RIGHTS AND:
>
> (I) The juvenile is eighteen years of age or older at the time of the interrogation OR THE JUVENILE MISREPRESENTS HIS OR HER AGE AS BEING EIGHTEEN YEARS OF AGE OR OLDER AND THE LAW ENFORCEMENT OFFICIAL ACTS IN GOOD FAITH RELIANCE ON SUCH MISREPRESENTATION IN CONDUCTING THE INTERROGATION; ~~if~~
>
> (II) The juvenile is emancipated from the parent, guardian, or legal or physical custodian; or ~~if~~
>
> (III) The juvenile is a runaway from a state other than Colorado and is of sufficient age and understanding.

Ch. 332, sec. 10, § 19–2–511(2), 1999 Colo. Sess. Laws 1369, 1374–75. Because the juvenile in the case before us did not fit any of the conditions stated in section 19–2–511(2)(a), the totality of the circumstances test the majority utilizes is plainly inapplicable under the statute.

In my opinion, we cannot graft the totality of the circumstances test onto section 19–2–511(5) because the General Assembly did not choose to do so in making its post-*Nicholas* amendments. We must presume that the General Assembly acted with full knowledge of our judicial precedent on the subject. *Pierson,* 48 P.3d at 1219; *Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1054 (Colo.1995). We consider the General Assembly's course of action and intent when enacting and amending statutes. *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1152 (Colo.2001). Therefore, because the General Assembly—in deciding how to address our *Nicholas* decision—chose not to create a totality of the circumstances test for written waivers of parental presence under section 19–2–511(5), except as provided in section 19–2–511(2), I must conclude that it did not intend a totality of the circumstances test to be applied to section 19–2–511(5)'s written waiver requirement.

Moreover, the facts the majority relies upon do not support its conclusion that the written waiver is the juvenile's as well as his parent's. The majority recites that both Jeron Grant and his parents signed a written *Miranda* waiver and his statement was voluntary and in full compliance with his constitutional rights. Maj. op. at 550. The majority observes that the juvenile and his parents had the opportunity to consult before the police interrogation, and they did so. Maj. op. at 550. However, the majority cites to no facts that show that the police presented the juvenile with the section 19–2–511(5) written waiver, that he read it, that he acknowledged its contents as his own, or that it was intended to be his written waiver. The opening recitation of the written instrument is solely in the "I . . . expressly waive" of the mother; no parallel "I" or "we" recitation records this instrument to be the son's written waiver. The face of the document evidences otherwise. The police were intent on securing the mother's written waiver and had only an oral waiver from the son. The juvenile's oral waiver is not sufficient under the statute.

### C.

### Not Harmless Error

The trial court's error in admitting Jeron Grant's second statement in absence of his written waiver was not harmless. An error is harmless if it does not affect the substantial rights of the defendant. Crim. P. 52(a). Where the error is not of constitutional dimension, the error will be disregarded if there is not a reasonable probability that the error contributed to the defendant's convic-

tion. *Salcedo v. People*, 999 P.2d 833, 841 (Colo.2000).

In this case, it is more than reasonably probable that the error in admitting Jeron Grant's confession to being an accessory by disposing of the shotgun contributed to his conviction for accessory. *Tevlin v. People*, 715 P.2d 338, 342 (Colo.1986). The error could have substantially influenced the verdict and affected the fairness of the proceedings. *Tevlin*, 715 P.2d at 342. Therefore, Jeron Grant's confession stating that he helped dispose of the shotgun was not harmless because there is a significant probability that the admitted statement substantially influenced the jury's verdict. *Salcedo*, 999 P.2d at 841.

## II.

Accordingly, I respectfully dissent. I would reverse the judgment of the court of appeals.

I am authorized to state that Justice MARTINEZ and Justice BENDER join in this dissent.