COLORADO COURT OF APPEALS                           **2017COA122**

Court of Appeals No. 15CA1920
Adams County District Court No. 14CR679
Honorable Francis C. Wasserman, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Martin Castruita Espinoza,

Defendant-Appellant.

JUDGMENT AFFIRMED, SENTENCE VACATED,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE FREYRE
Webb and Booras, JJ., concur

Announced September 21, 2017

Cynthia H. Coffman, Attorney General, Megan C. Rasband, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Lauretta A. Martin Neff, Alternate Defense Counsel, Bayfield, Colorado, for
Defendant-Appellant

¶ 1     Defendant, Martin Castruita Espinoza, appeals the judgment of conviction entered on jury verdicts finding him guilty of ten counts of attempted murder, twenty-three counts of first degree arson, ten crime of violence counts, and multiple misdemeanors. Espinoza raises two issues on appeal. First, he challenges the admissibility of his statements to police, alleging that because he was in custody during the questioning, the statements were inadmissible. Second, he contends the trial court misconstrued the applicable sentencing statutes and erroneously concluded it had to impose consecutive sentences. The latter contention involves applying existing law to unique facts.

¶ 2     We disagree with his first contention and affirm the judgments of conviction. However, we agree with his second contention, vacate his 160-year prison sentence, and remand for resentencing.

## I.     Background

¶ 3     This case involved the burning of an apartment complex in which Espinoza had previously lived. Espinoza's mother lived in apartment 303, and Espinoza had lived with her until two months before the fire. The day before the fire, Espinoza's mother placed all

of Espinoza's personal belongings on the apartment's balcony. She texted him and said that he needed to retrieve them.

¶ 4 The next day, Adams County Sheriff's deputies and firefighters responded to a structure fire and found the apartment complex engulfed in flames. All the residents were able to leave the building. Espinoza, his mother, his aunt, and his cousin were part of the crowd watching the building burn. While on scene, Espinoza's aunt and cousin told the police that they were concerned that Espinoza was potentially involved with the fire.

¶ 5 The police interviewed Espinoza and his family members as part of the fire investigation. A deputy transported Espinoza to the police station, where he waited for several hours before being interviewed.[1] Espinoza told the police that he had been panhandling at a Walmart across the street from the apartment complex when he saw people running toward the building, saying

---

[1] The trial court did not make a finding of the exact amount of time Espinoza waited in the interview room. Espinoza states it was "nearly five hours." He was brought to the police station somewhere between a half hour and forty-five minutes after 1:44 p.m. No testimony was offered regarding how long it took to get to the police station from the scene or how long it took Espinoza to get from the patrol car to the interview room.

there was a fire. After observing the fire for himself, Espinoza called his sister from the Walmart courtesy phone and told her he was across the street at Walmart and could see the fire. Police ended the interview when Espinoza invoked his right to counsel.

¶ 6     A Walmart surveillance video showed that the fire started on the third floor of the apartment building, that Espinoza was in the Walmart parking lot, and that he used the courtesy phone. Arson investigators concluded that the fire was incendiary and had started on the balcony of apartment 303. A Walmart employee described a male matching Espinoza's description using the courtesy phone and smelling like charcoal, lighter fluid, and smoke.

## II.     Custodial Interrogation

¶ 7     Espinoza contends that the trial court failed to consider several factors in finding that he was not in custody at the police station, including the several-hour wait in the interview room, the presence of two armed detectives during the interview, and the confrontational question near the end of the interview. Because the trial court's detailed factual findings, supported by the record, show that Espinoza was not in custody, we affirm its order denying Espinoza's motion to suppress.

## A. Additional Facts

¶ 8 Before trial, Espinoza moved to suppress his statements from a videotaped interview with the police. He claimed that he was in custody and that the police failed to give him *Miranda*[2] warnings. The trial court rejected his custody claim and, in a detailed order, made the following findings:

- Police learned that Espinoza was a potential suspect at the scene. Acknowledging that they had no probable cause, the police requested that he come to the police station for an interview, and Espinoza agreed.

- Espinoza had no transportation and accepted a ride from an officer.

- Espinoza consented to a pat-down search before entering the officer's car.

- Police did not handcuff Espinoza.

- Police found a lighter in Espinoza's pocket and asked to keep it. Espinoza did not object.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- Once at the police station, an officer took Espinoza through at least one locked door to the detective division on the second floor.

- The officer placed Espinoza in an interview room, unrestrained, and provided him with a bottle of water.

- Espinoza's mother and stepfather were also at the police station in a different room.

- After "some time" and the completion of two other interviews, two detectives interviewed Espinoza.

- The tone of the interview was conversational, and the detectives used no coercive interrogation methods or techniques.

- The detectives wore plain clothes.

- One of the detectives told Espinoza that he was not under arrest and was free to leave.

- Although closed, the door was located next to Espinoza and nothing blocked his exit from the interview room.

- Espinoza acknowledged a history of substance abuse and became emotional when speaking about his mother.

- Espinoza was not psychologically unstable, did not appear intellectually impaired, was not physically impaired, was not ill, and was not incoherent.

- Espinoza was responsive to questions and very cooperative.

- When confronted with potential evidence that might refute his statements, Espinoza stated he understood the criminal justice system. He explained that if he was a suspect, he wanted a lawyer and wanted to leave. He repeated this statement.

- The detectives released Espinoza within five minutes of his request to leave and after collecting his clothing as evidence.

- Espinoza became emotional during the clothing collection, and the detectives never informed him he could refuse their request to collect it.

- The interview lasted for a relatively short period of time.

Although not mentioned by the court, the record also established the following:

- Both detectives were armed during the interrogation.

6

- The interrogation was in a secured, non-public area of the police station. There were double doors that needed to be unlocked to enter, but did not need to be unlocked to exit.

- Espinoza sat in the interview room for several hours before the interview began.

- The interview lasted twenty-seven minutes.

¶ 9 The trial court concluded that the totality of the circumstances demonstrated that Espinoza voluntarily spoke with the detectives and was not in custody when he did so.

B. Standard of Review and Applicable Law

¶ 10 Whether a defendant is "in custody" for *Miranda* purposes presents a mixed question of law and fact. *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010). We defer to the trial court's factual findings and uphold them on review where they are supported by competent evidence in the record. *Id.* at 878; *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002). However, we review the legal effect of the facts de novo. *Matheny*, 46 P.3d at 462. We also may consider undisputed facts evident in the record, including those shown by a

video recording of an interrogation. *People v. Pleshakov*, 2013 CO 18, ¶ 16.

¶ 11 A suspect is "in custody" for purposes of *Miranda* if "under the totality of the circumstances, a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Matheny*, 46 P.3d at 468. In determining custody, a court should consider the following non-exhaustive factors, none of which is determinative:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*People v. Begay*, 2014 CO 41, ¶ 17 (quoting *Matheny*, 46 P.3d at 465-66); *Effland*, 240 P.3d at 874. Additionally, the court may consider the following circumstances:

(10) "whether the officers told the defendant he was free to leave";

(11) "whether the officers used a degree of force traditionally associated with custody and arrest"; and

(12) whether the defendant "appeared to be the prime suspect in the investigation."

*People v. Holt*, 233 P.3d 1194, 1195, 1197 (Colo. 2010). The *Miranda* custody determination requires applying an objective, reasonable person standard. *Matheny*, 46 P.3d at 465.

### C. Application

¶ 12 We conclude that the trial court properly found that Espinoza was not in custody for *Miranda* purposes when detectives interviewed him. The record shows that Espinoza agreed to speak with the detectives, consented to a pat-down search, and rode unrestrained to the police station. *See Pleshakov*, ¶¶ 27-34 (the defendant was not in custody even though police ordered him out of his vehicle and patted him down for weapons). The detectives told Espinoza he was not under arrest and was free to leave. *See Matheny*, 46 P.3d at 467 (telling the defendant he was not under arrest and asking him to come to the police station supported a

finding of no custody); *see also People v. Hankins*, 201 P.3d 1215, 1219 (Colo. 2009) (repeated statements to the defendant that he was free to leave supported a finding of no custody).

¶ 13    The record further shows that Espinoza was not physically restrained and that the tone of the interview was conversational. *See People v. Cowart*, 244 P.3d 1199, 1204 (Colo. 2010) (lack of physical restraint and officer's conversational tone supported the conclusion that defendant was not in custody). And, although Espinoza was separated from his mother and stepfather, the record supports the court's finding that the detectives did not employ coercive interrogation methods. *See People v. Minjarez*, 81 P.3d 348, 353 (Colo. 2003) ("The *Miranda* Court was particularly concerned about . . . coercive interrogation techniques applied to individuals who are isolated and deprived of contact with friends and family.").

¶ 14    We are not persuaded by Espinoza's reliance on *People v. Elmarr*, where the court found the defendant was in custody based in part on the officers' transport of the defendant to the police station, his placement into a nonpublic room with the door closed, fifty minutes of aggressive questioning, and detention at the police

station for nearly an hour after he asked to leave. 181 P.3d 1157, 1163 (Colo. 2008). The court noted that the case was a close one and said, "[i]mportantly, [Elmarr] was never told he was not under arrest, or that he was free to leave." *Id.*

¶ 15 In contrast, the detectives told Espinoza that he was not under arrest and was free to leave. Moreover, the interview was conversational and lasted for only twenty-seven minutes. Finally, when Espinoza requested counsel, the police immediately ceased questioning and released him five minutes later.

¶ 16 Additionally, we are not convinced that the detectives' confrontation of Espinoza with evidence that might refute his statement requires a different result. Espinoza said that he understood the criminal justice system and immediately invoked his right to counsel in response to the confrontation. *See People v. Figueroa-Ortega*, 2012 CO 51, ¶ 10 ("[M]erely confronting a suspect with the evidence against him . . . does not, by itself, constitute an infringement on his liberty, much less the kind of infringement associated with a formal arrest.").

¶ 17 Further, while we agree that the detectives' visible firearms were part of the totality of the circumstances, they did not create a

11

custodial situation because the detectives did not make a show of force or restrain Espinoza in any way. *See People v. Barraza*, 2013 CO 20, ¶ 22 (the presence of four uniformed officers did not create a custodial situation where none of them drew weapons, handcuffed the defendant, or used any type of force against him).

¶ 18 After considering the totality of the circumstances, we conclude that substantial record evidence supports the court's finding that Espinoza was not restrained to the degree associated with a formal arrest and therefore was not in custody when interviewed by the detectives.

### III. Concurrent or Consecutive Sentencing

¶ 19 Espinoza next contends that the court misapprehended the applicable law when it ruled that it was required to impose consecutive sentences for his attempted first degree murder convictions. We agree.

### A. Additional Facts

¶ 20 Espinoza does not dispute that the prosecution's evidence established that he started a fire on the balcony of his mother's apartment. As relevant to the sentencing issue, a jury convicted him of ten counts of attempted first degree murder, each naming a

different victim, and ten crime of violence sentence enhancers.  The court sentenced Espinoza to sixteen years in prison for each attempted murder conviction and concluded that the crime of violence statute, section 18-1.3-406(1)(a), C.R.S. 2017, mandated consecutive sentences.  It reasoned "that a person convicted of two or more separate crimes of violence arising out of the same incident shall be sentenced for such crimes so that the sentences are served consecutively rather than concurrently," and that "the Court of Appeals [has] held that when each crime is a separate crime of violence, this section requires the Court to impose consecutive sentences for each offense."  It concluded that each attempted first degree murder conviction constituted a separate crime of violence requiring consecutive sentences.

B.      Standard of Review and Applicable Law

¶ 21    We review a trial court's sentencing decision for an abuse of discretion.  *People v. Muckle*, 107 P.3d 380, 382 (Colo. 2005).  A trial court abuses its discretion if its ruling is "manifestly arbitrary, unreasonable, unfair, or contrary to law."  *Dickinson v. Lincoln Bldg. Corp.*, 2015 COA 170M, ¶ 7.  However, we review questions of statutory interpretation, including a trial court's application of the

13

sentencing statutes, de novo. *Juhl v. People*, 172 P.3d 896, 902 (Colo. 2007); *People v. Torrez*, 2013 COA 37, ¶ 32; *People v. Phillips*, 2012 COA 176, ¶ 171.

¶ 22    Our primary goal is to give effect to the General Assembly's purpose or intent in enacting the statute. *Jefferson Cty. Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo. 2010); *People v. Cooper*, 27 P.3d 348, 354 (Colo. 2001). We begin by looking to the express language of the statute. *Gerganoff*, 241 P.3d at 935. We must read words and phrases "in context" and in accordance with "the rules of grammar and common usage." § 2-4-101, C.R.S. 2017; *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001). In so doing, we must give effect to the entire statute. § 2-4-201(1)(b), C.R.S. 2017; *see also A.S. v. People*, 2013 CO 63, ¶ 12.

¶ 23    If the statutory language is unambiguous and the legislative intent is reasonably certain, we look no further. *Gerganoff*, 241 P.3d at 935. However, if the language is ambiguous, or if the statute appears to conflict with other provisions, then we may consider other factors, such as legislative history or the consequences of a particular construction. § 2-4-203, C.R.S. 2017; *Cooper*, 27 P.3d at 354.

¶ 24    If statutes governing the same subject appear to conflict, we must attempt to reconcile them by giving "harmonious and sensible effect" to all parts of the statutory scheme. *Cooper*, 27 P.3d at 354 (quoting *Martin v. People*, 27 P.3d 846, 851 (Colo. 2001)). If the conflict is irreconcilable, however, a "special or local provision prevails as an exception to [a] general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." *Id.* at 355 (quoting § 2-4-205, C.R.S. 2017).

¶ 25    When a court "imposes consecutive sentences under the mistaken belief that it has no discretion to impose concurrent sentences," "[a] remand for resentencing is appropriate." *People v. O'Connell*, 134 P.3d 460, 466 (Colo. App. 2005).

## C.    Application

¶ 26    We begin by concluding that the general provision of section 18-1-408(3), C.R.S. 2017, which authorizes discretionary consecutive sentences in multi-victim cases, can be reconciled with section 18-1.3-406(1)(a), which requires consecutive sentencing for "separate crimes of violence." Next, we conclude that Espinoza's ten attempted murder convictions were supported by identical

15

evidence, despite naming different victims, because the same evidence formed the basis of each conviction. Last, we hold that separately named victims do not create separate crimes of violence under section 18-1.3-406(1)(a) when identical evidence supports each conviction, and in such circumstances, a court retains discretion to impose concurrent sentences under section 18-1-408(3).

    1.    The "[I]dentical [E]vidence" Provision of Section 18-1-408(3) Can Be Reconciled with the "[S]eparate [C]rimes" Provision of Section 18-1.3-406(1)(a)

¶ 27    Part 4 of title 18, article 1 of the Colorado Revised Statutes, entitled "Rights of Defendant," confers substantive rights "upon every person accused of an offense." § 18-1-401, C.R.S. 2017. Under section 18-1-408, specific procedures and sentencing rules apply where a defendant is charged with separate counts "based on the same act or series of acts arising from the same criminal episode." § 18-1-408(2). Where such counts "are supported by identical evidence . . . the sentences imposed shall run concurrently; *except that, where multiple victims are involved, the court may, within its discretion, impose consecutive sentences.*" § 18-1-408(3) (emphasis added).

¶ 28    Section 18-1.3-406 is titled "Mandatory sentences for violent crimes - definitions." It requires that "a person convicted of two or more separate crimes of violence arising out of the same incident [shall be sentenced for such crimes] so that his or her sentences are served consecutively rather than concurrently." § 18-1.3-406(1)(a).[3]

¶ 29    At first glance, sections 18-1-408(3) and 18-1.3-406(1)(a) appear to conflict. Both apply to violent crimes (because part 4 applies to every person accused), and both restrict a trial court's sentencing discretion in situations where there are multiple counts arising from a single criminal episode. *See Marquez v. People*, 2013 CO 58, ¶ 22 ("same criminal episode" under § 18-1-408(2) and "same incident" under § 18-1.3-406(1)(a) mean the same thing). One generally requires concurrent sentencing and allows consecutive sentencing only in circumstances involving multiple victims, while the other *requires* consecutive sentencing.

_____

[3] Although not applicable here, we note that section 18-1.3-406(1)(c), C.R.S. 2017, permits a court to impose concurrent sentences for two or more separate crimes of violence arising out of the same incident when one of the crimes is aggravated robbery, second degree assault, or escape.

17

¶ 30    Several divisions of this court have reconciled these two provisions by reasoning that "separate crimes" under section 18-1.3-406(1)(a) are those crimes that are not "based on the same act or series of acts" and are not "supported by identical evidence" under section 18-1-408(2), (3). *People v. O'Shaughnessy*, 275 P.3d 687, 697 (Colo. App. 2010), *aff'd but criticized on other grounds*, 2012 CO 9; *People v. Jurado*, 30 P.3d 769, 773 (Colo. App. 2001); *People v. Hahn*, 813 P.2d 782, 784 (Colo. App. 1991).

¶ 31    We find this reconciliation persuasive. It follows from the ordinary meanings of "identical" and "separate." Moreover, it gives harmonious and sensible effect to both provisions by continuing to protect defendants from excessive punishment for crimes based on identical evidence while, at the same time, requiring harsher punishments for separate acts of violence.

¶ 32    Accordingly, we conclude that sections 18-1-408(3) and 18-1.3-406(1)(a) do not conflict, but instead provide for different sentencing requirements in two non-overlapping sets of circumstances. For multiple violent crimes arising from the same criminal episode, section 18-1-408(3) requires concurrent sentencing for counts based on the "same act or series of acts" and

18

supported by "identical evidence," § 18-1-408(2), (3), but in cases of multiple victims authorizes the court to impose consecutive sentences in its discretion. All other violent crimes arising from the same criminal episode and not supported by identical evidence are "separate" under section 18-1.3-406(1)(a), and therefore require consecutive sentencing.

### 2. The Attempted First Degree Murder Convictions are Supported by "[I]dentical [E]vidence"

¶ 33    Espinoza's convictions for attempted first degree murder are *not* "separate crimes of violence" under section 18-1.3-406(1)(a). The relevant question in this context is whether the evidence supporting each conviction is identical and therefore not separate. *See Jurado*, 30 P.3d at 773 (consecutive sentencing is required when "evidence supporting the convictions is not 'identical' within the meaning of § 18-1-408(3)"). "To determine whether the evidence is identical, a court must decide whether the separate convictions were based on more than one distinct act and, if so, whether those acts were separated by time and place." *People v. Glasser*, 293 P.3d 68, 79 (Colo. App. 2011). This inquiry "is not a strict analysis to determine if one particular fact is necessary to one conviction, but

not the other, thereby making the evidence identical or not identical." *Juhl*, 172 P.3d at 902. Instead, the answer "turns on whether the charges result from the same act, so that the evidence of the act is identical, or from two or more acts fairly considered to be separate acts, so that the evidence is different." *Id.*

¶ 34 Here, no one disputes that a single act of arson caused the building to catch fire or that multiple victims suffered harm as a result of the single act of fire-setting. *See, e.g., O'Shaughnessy*, 275 P.3d at 697 (imposing mandatory consecutive sentences for attempted murder, attempted aggravated robbery, and second degree assault was error because "all three offenses were based on identical evidence and occurred in a single criminal episode lasting less than sixty seconds"). The evidence supporting each attempted murder conviction was identical (one fire-setting), and no evidence shows that Espinoza performed separate, volitional acts against any of the named victims, separated by time or place. *See Hahn*, 813 P.2d at 784 ("[I]f guilt of two or more crimes of violence is established by identical evidence, the crimes are not 'separate[.]'"); *cf. Qureshi v. Dist. Court*, 727 P.2d 45, 47 (Colo. 1986) (the defendant's initial stabbing of the victim's abdomen followed by the

20

victim's escape to another area of the apartment and the defendant's attempted stabbing of her in the bathroom "were two separate and different sets of acts which occasioned two crimes").

¶ 35    Even so, the People argue that because multiple victims are involved, the evidence is not identical and, therefore, the trial court properly refused to exercise its discretion. This argument has support. Indeed, several divisions of this court have concluded that crimes involving multiple victims were not based on identical evidence because each count involved evidence about a different victim. *See People v. Harris*, 2016 COA 159, ¶ 56 ("We conclude that the existence of multiple victims created factually distinct offenses."); *People v. Grant*, 30 P.3d 667, 670 (Colo. App. 2000) ("[W]hen multiple convictions arise from crimes committed upon different victims, the evidence is not identical."), *aff'd*, 48 P.3d 543 (Colo. 2002); *People v. Wafai*, 713 P.2d 1354, 1357 (Colo. App. 1985) ("[D]efendant's multiple convictions arise from crimes committed upon different victims; therefore, the evidence is not identical, and § 18-1-408(3), C.R.S. (1978 Repl. Vol. 8) is inapplicable."), *aff'd*, 750 P.2d 37 (Colo. 1988); *People v. Cullen*, 695 P.2d 750, 752 (Colo. App. 1984) ("[W]here, as here, the multiple

21

convictions arise from crimes committed upon multiple victims, the evidence is not identical and therefore that statute [§ 18-1-408(3)] is inapplicable."); *see also Hahn*, 813 P.2d at 784 (considering fact that there were "separate victims" as one consideration among several that established separate violent crimes). However, these cases are distinguishable on their facts.

¶ 36    For instance, *Harris* did not concern the crime of violence statute or its interplay with section 18-1-408. Harris contended that her multiple convictions for animal cruelty violated double jeopardy and should be merged into a single conviction because they were based on identical evidence. *Harris*, ¶ 37. The division rejected this argument, holding that the neglect of each animal, which occurred over a period of time, was a separate volitional act that constituted separate offenses for double jeopardy purposes. *Id.* at ¶ 53. It affirmed the separate convictions and the concurrent sentences imposed thereon. *Id.* at ¶¶ 56-57.

¶ 37    Similarly, the *Grant* case did not involve the crime of violence statute or its interplay with section 18-1-408. Rather, the trial court concluded that section 18-1-408(3) did not authorize consecutive sentences for multiple convictions arising from crimes

22

committed against different victims. *Grant*, 30 P.3d at 670. A division of this court disapproved that ruling, noting that the plain language of the statute gave the court discretion to impose consecutive sentences for multiple crimes involving different victims. *Id.*

¶ 38 True enough, *Hahn, Wafai,* and *Cullen* all concerned crimes of violence involving more than one victim; yet, all are distinguishable from this case. The *Hahn* division determined that the defendant's swerving maneuvers directed at two different police cars during a single eluding formed distinct factual predicates for two assault convictions. 813 P.2d at 783. It concluded that because different evidence was required to establish guilt for each assault, the assaults were "separate" crimes under the crime of violence statute and required consecutive sentences. *Id.* at 784.

¶ 39 *Wafai* and *Cullen* both involved double murders in which the trial courts imposed discretionary consecutive life sentences for the two convictions. Citing to section 18-1-408(3), both divisions concluded that consecutive sentences could be imposed because different evidence would be needed to prove the deaths of the separate victims. *Wafai*, 713 P.2d at 1357; *Cullen*, 695 P.2d at 752.

23

¶ 40    In contrast to these cases, the record here shows a single

volitional act of fire-setting on the balcony of apartment 303.  This

single act destroyed multiple apartments and threatened the lives of

multiple victims.  Because the evidence required to prove all ten

attempted murder counts is identical (the single act of fire-setting),

the attempted murder convictions are not "separate crimes" under

section 18-1.3-406(1)(a) and consecutive sentencing was not

required.  *See Juhl,* 172 P.3d at 902 (whether two charges are

supported by identical evidence turns on whether they result from

the same criminal act).

¶ 41    Finally, we note that adoption of the People's argument would

render the plain language of section 18-1-408(3) meaningless.

Specifically, following their reasoning, two crimes of violence

naming different victims and supported by identical evidence would

simultaneously require mandatory consecutive sentencing under

section 18-1.3-406(1)(a) and discretionary consecutive sentencing

under section 18-1-408(3).  In our view, to give effect to the plain

language of both statutes, some evidence beyond the existence of

multiple victims must exist to establish a "separate crime[]" under

section 18-1.3-406(1)(a).  Because that evidence did not exist here,

24

we conclude the trial court erred when it found that consecutive sentences were mandatory. Therefore, we vacate Espinoza's sentence and remand for resentencing.

## IV.  Conclusion

¶ 42    We affirm the judgments of conviction. We vacate the sentence and remand the case for resentencing consistent with this opinion.

JUDGE WEBB and JUDGE BOORAS concur.